# EXHIBIT 7

**Plaintiff's Opposition to Motion for Summary Judgment**

```
IN THE UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF MICHIGAN

BRIGHTON OPTICAL, INC.,
et al.,
     Plaintiffs,
Vs.              No. 03-74974
VISION SERVICE PLAN,
     Defendant.
_____/


              Deposition of
            CHERYL JOHNSON
         Tuesday, April 12, 2005


Reported by:
SHARON CABELLO, RPR

CSR No. 3080

Job No. 48635A
```

Page 1

```
                 APPEARANCES
For the Plaintiffs:
   WITMER, KARP & WARNER LLP
   Attorneys at Law
   BY: ERIC H. KARP, Esq.
   22 Batterymarch Street
   Boston, Massachusetts  02109
   (617) 423-7250

For the Defendants:
   VISION SERVICE PLAN
   BY: RAOUL A. RENAUD,
       Senior Counsel
   3333 Quality Drive
   Rancho Cordova, CA  95670-7985
   (916) 463-7506

            --oOo--
```

Page 2

```
              INDEX
Examination by
   MR. KARP

            ---oOo---

       INDEX OF EXHIBITS
Number    Description              Page
 23  Web Page of Cheryl Johnson's Bio      23
 24  VSP's Further Responses to Plaintiffs' 68
     First Interrogatories
 25  VSP Eyecare Consumer Study Report     90
 26  VSP Quality Assurance Committee      102
     Meeting, August 6, 1993, Page Eight
 27  Declaration of Cheryl Johnson in     110
     Support of VSP's Brief
 28  Affidavit of Cheryl Johnson in Support 116
     of VSP's Brief
 29  Pearle Vision Letter dated March 26,  120
     2001 to Johnson
 30  Letters to Drs. Webb, Watsky and Hagan 124
 31  VSP Peer review Plan and Fair Hearing 134
     Procedure 9/07/01
 32  VSP Peer Review Plan and Fair Hearing 134
     Procedure 11/19/04
```

Page 3

```
        INDEX OF EXHIBITS (Continued)
Number    Description              Page
 33  VSP Hearing Officer Guidebook        136
 34  VSP's Out-of-Network (OON) Reduction 140
     Strategy

            ---oOo---
```

Page 4

1 (Pages 1 to 4)

Esquire Deposition Services
916.448.0505

**Page 61**

1 this case are those that are signatories to Franchise
2 Agreements with those entities?
3 A. Yes.
4    MR. RENAUD: Aren't some of them employees?
5 Isn't, for instance, Dr. Runstrom?
6    MR. KARP: I was going to get to that in a
7 moment.
8    MR. RENAUD: All right.
9 Q.   MR. KARP: And do you further understand that
10 the doctors that are signatories to the Franchise
11 Agreements own all of the assets, the furniture, the
12 fixtures, the equipment and the inventory in their
13 practice and their dispensary; is that your
14 understanding?
15 A. I don't know the specifics of what they do
16 own, but it is certainly my understanding that they do
17 not control all aspects of their practice.
18 Q. Well, with all respect, that's not the
19 question I asked.
20 A. Well --
21 Q. Is it your understanding that the Plaintiffs
22 in this case that are signatories to a Franchise
23 Agreement own all of the furniture, fixtures,
24 equipment, and inventory in their practice and their
25 dispensaries?

**Page 62**

1    MR. RENAUD: Asked and answered.
2    MR. KARP: Respectfully disagree. I would
3 like an answer to the question.
4 Q. Are you saying you don't know that?
5 A. I said I don't know the specifics of their
6 Franchise Agreement.
7 Q. Do you understand that the Plaintiffs in this
8 case are those that are signatories to Franchise
9 Agreements with franchise companies or doctors that are
10 employed by those doctors?
11 A. That's consistent with my understanding.
12 Q. Are you also aware that there are doctors who
13 are employed by these franchise companies in locations
14 that the franchise companies themselves owns?
15 A. I don't have a detailed understanding of that
16 relationship, no.
17 Q. And you didn't when you signed this Answer to
18 Interrogatory?
19 A. I may not be understanding your question, but
20 I don't specifically see that detailed in this
21 Interrogatory.
22 Q. That's precisely correct. Which is why I am
23 asking the question.
24    Have you ever seen a list of doctors who are
25 on restricted or limited membership?

**Page 63**

1 A. At some point in the past I would have seen
2 it, yes.
3 Q. Do you have an understanding of whose function
4 it is to maintain that list?
5 A. Yes.
6 Q. Would that be Janice Wilson and her employees?
7 A. Yes.
8 Q. Have you ever seen a report from Janice Wilson
9 as to the number of people, that is to say doctors, on
10 this list?
11 A. Yes.
12 Q. Is this document which we marked as Exhibit 9
13 one such report?
14 A. I don't recall seeing this report, and this is
15 not the report that I was thinking of. But I can see
16 that it appears that it was sent to me.
17 Q. Okay. So does that mean that you do not
18 recall seeing it before today?
19 A. I do not recall seeing this report before
20 today.
21 Q. And then I take it, then, it was not a
22 document on which you relied in formulating your answer
23 to Interrogatory No. 9?
24 A. No.
25 Q. Have you received other similar reports from

**Page 64**

1 time to time from Janice Wilson or other people in the
2 Columbus office?
3 A. I have seen from time to time a list or number
4 of grandfathered doctors.
5 Q. Have you received a report such as this one,
6 which looks like a summary of the numbers of doctors on
7 that list?
8 A. I have not received this detailed information,
9 but I have seen a summary report of numbers of doctors.
10 Q. When was the last time you saw such a list?
11 A. Probably a couple of years ago.
12 Q. Do you know when it was created?
13 A. Probably a couple of years ago.
14 Q. Do you know the circumstances under which it
15 was created?
16 A. We were interested in how many grandfathered
17 doctors remained.
18 Q. And who is "we"?
19 A. My management staff and I.
20 Q. Why were you interested in knowing that?
21 A. Because we periodically review statistics
22 about our network so that we understand how many
23 doctors that we have, and we were interested in knowing
24 the extent to which doctors who may have been
25 originally grandfathered were still practicing.

Case 2:03-cv-74974-NGE ECF No. 95-8, PageID.2518 Filed 09/16/05 Page 4 of 8

## Page 61

1 this case are those that are signatories to Franchise
2 Agreements with those entities?
3 A. Yes.
4     MR. RENAUD: Aren't some of them employees?
5 Isn't, for instance, Dr. Runstrom?
6     MR. KARP: I was going to get to that in a
7 moment.
8     MR. RENAUD: All right.
9 Q.     MR. KARP: And do you further understand that
10 the doctors that are signatories to the Franchise
11 Agreements own all of the assets, the furniture, the
12 fixtures, the equipment and the inventory in their
13 practice and their dispensary; is that your
14 understanding?
15 A. I don't know the specifics of what they do
16 own, but it is certainly my understanding that they do
17 not control all aspects of their practice.
18 Q. Well, with all respect, that's not the
19 question I asked.
20 A. Well --
21 Q. Is it your understanding that the Plaintiffs
22 in this case that are signatories to a Franchise
23 Agreement own all of the furniture, fixtures,
24 equipment, and inventory in their practice and their
25 dispensaries?

## Page 62

1     MR. RENAUD: Asked and answered.
2     MR. KARP: Respectfully disagree. I would
3 like an answer to the question.
4 Q. Are you saying you don't know that?
5 A. I said I don't know the specifics of their
6 Franchise Agreement.
7 Q. Do you understand that the Plaintiffs in this
8 case are those that are signatories to Franchise
9 Agreements with franchise companies or doctors that are
10 employed by those doctors?
11 A. That's consistent with my understanding.
12 Q. Are you also aware that there are doctors who
13 are employed by these franchise companies in locations
14 that the franchise companies themselves owns?
15 A. I don't have a detailed understanding of that
16 relationship, no.
17 Q. And you didn't when you signed this Answer to
18 Interrogatory?
19 A. I may not be understanding your question, but
20 I don't specifically see that detailed in this
21 Interrogatory.
22 Q. That's precisely correct. Which is why I am
23 asking the question.
24     Have you ever seen a list of doctors who are
25 on restricted or limited membership?

## Page 63

1 A. At some point in the past I would have seen
2 it, yes.
3 Q. Do you have an understanding of whose function
4 it is to maintain that list?
5 A. Yes.
6 Q. Would that be Janice Wilson and her employees?
7 A. Yes.
8 Q. Have you ever seen a report from Janice Wilson
9 as to the number of people, that is to say doctors, on
10 this list?
11 A. Yes.
12 Q. Is this document which we marked as Exhibit 9
13 one such report?
14 A. I don't recall seeing this report, and this is
15 not the report that I was thinking of. But I can see
16 that it appears that it was sent to me.
17 Q. Okay. So does that mean that you do not
18 recall seeing it before today?
19 A. I do not recall seeing this report before
20 today.
21 Q. And then I take it, then, it was not a
22 document on which you relied in formulating your answer
23 to Interrogatory No. 9?
24 A. No.
25 Q. Have you received other similar reports from

## Page 64

1 time to time from Janice Wilson or other people in the
2 Columbus office?
3 A. I have seen from time to time a list or number
4 of grandfathered doctors.
5 Q. Have you received a report such as this one,
6 which looks like a summary of the numbers of doctors on
7 that list?
8 A. I have not received this detailed information,
9 but I have seen a summary report of numbers of doctors.
10 Q. When was the last time you saw such a list?
11 A. Probably a couple of years ago.
12 Q. Do you know when it was created?
13 A. Probably a couple of years ago.
14 Q. Do you know the circumstances under which it
15 was created?
16 A. We were interested in how many grandfathered
17 doctors remained.
18 Q. And who is "we"?
19 A. My management staff and I.
20 Q. Why were you interested in knowing that?
21 A. Because we periodically review statistics
22 about our network so that we understand how many
23 doctors that we have, and we were interested in knowing
24 the extent to which doctors who may have been
25 originally grandfathered were still practicing.

16 (Pages 61 to 64)

Esquire Deposition Services
916.448.0505

## Page 65

Q. To your knowledge were any steps ever taken to specifically remove doctors from the grandfathered list?
A. Not to my knowledge.
Q. Was any company wide decision made to revoke, terminate the grandfather status that was conferred in 1995?
A. Not to my knowledge.
Q. How many lists have you ever seen of grandfathered doctors?
A. Lists of names, or lists of numbers?
Q. Lists of names.
A. Probably two or three.
Q. And can you recall how it is that you came to receive those two or three lists?
A. Is your question via what means I received it, or the purpose for it?
Q. The purpose.
A. Simply to understand and update of the number of doctors originally on the grandfather list who remained on the grandfather list.
Q. To your knowledge were each of these lists generated by Janice Wilson or people under her supervision?
A. Yes.

## Page 66

Q. Have you ever had any conversation with Janice Wilson about the status of grandfathered doctors?
A. I don't recall any specific conversation, but I would expect during the course of being updated the couple of times that I have been over the years we probably had a brief conversation about it.
Q. Can you recall the substance of any such conversation?
A. It would have simply been regarding the number of doctors that had originally been on the list as compared to the number of doctors that would have been on the list at that time.
Q. Looking at Exhibit 9, do you have any understanding of what Janice Wilson means when she uses the phrase "Doctor does not own dispensary"?
A. She would be referring to the fact that the doctor does not own and control their practice, and the dispensary is a part of their practice.
Q. Do you have any understanding as to whether that phrase encompasses both doctors that are signatories to Franchise Agreements and doctors that are employed by franchise companies in locations owned by franchise companies?
A. Can you repeat question?
Q. Let me phrase it this way. Is it your

## Page 67

understanding that Pearle Vision, as an example, has corporately owned locations as well as franchise locations?
A. I believe that's the case. But I don't know the specifics of their arrangement with their doctors.
Q. I'm not asking you for the arrangements with the doctors, I am starting with the basic.
   Is it your understanding that Pearle Vision has both franchise locations and locations that are corporately owned?
A. That would be my understanding.
Q. And is it your further understanding with respect to locations that Pearle Vision might corporately own that there is a doctor on the premises in at least some of these locations?
A. That would be my understanding.
Q. And is it further your understanding that some of the doctors that practice in those corporately owned locations were granted grandfather status in 1995?
A. I do not know the specifics of which type of doctors affiliated with Pearle are on the list.
Q. Are you aware that there are doctors on the list that are employed by companies in corporately owned locations where those companies also have franchise locations?

## Page 68

A. That would be my understanding.
Q. But you don't know how many doctors are in that category versus how many doctors are in the category of franchisees who own the assets of their practice?
A. I would expect that they would be the franchisees that you are referring to.
Q. So is it your understanding that when Janice Wilson reported that there were 271 doctors on the list in August of 1995 under the category "Doctor does not own dispensary," that that would refer to solely doctors who are signatories to Franchise Agreements and their employees?
A. That would be my understanding, but I don't know the specifics.
   MR. KARP: Let's mark the Interrogatory answers as the next in order, which would be 24.
   (Plaintiff's Exhibit 24 was marked for identification.)
Q. MR. KARP: Can you identify this as a true copy of a Declaration that you signed under the penalty of perjury on December 19, 2003?
A. It appears to be so, yes.
Q. Okay. Would you like to take a moment to look through the document to make sure that it is, in fact,

### Page 85

1  would suggest that the Plaintiffs are not free to
2  choose to dispense or not to their patients?
3  A.    No.
4  Q.    Do you have any information to suggest that
5  the Plaintiffs in this case are not free to choose
6  whether to advertise or not?
7  A.    No.
8  Q.    Do you have any personal knowledge regarding
9  the day-to-day, week-to-week, month-to-month
10 relationship between any of the Plaintiffs in this case
11 and the companies with which they have signed Franchise
12 Agreements?
13 A.    No.
14 Q.    Is the standard under Condition "E" whether or
15 not the doctor actually has control on a day-to-day
16 basis of their practice and their dispensary?
17       MR. RENAUD: Object to the form of the
18 question.
19       THE WITNESS: Can you repeat the question,
20 please.
21       MR. KARP: Could you read it back, please. We
22 will see if it's a good question.
23       (Record was read by the reporter.)
24       THE WITNESS: I don't know what you mean by
25 "standard." If what you are asking me is does

### Page 86

1  Condition "E" provide that doctors must own and
2  control, then the answer is yes.
3  Q.    MR. KARP: That wasn't my question.
4  A.    Then I don't understand your question.
5  Q.    I will try to rephrase it.
6        Under Condition "E" is it a fact that VSP
7  requires that the doctor actually have day-to-day
8  control of their practice including their dispensary?
9  A.    Yes.
10 Q.    Now. Can I direct your attention, please, to
11 paragraph 10 of your Declaration. It begins at the
12 bottom of page 3.
13       Now, in the second sentence you say that "VSP
14 believes that doctors who actually own their own
15 practices as well as the dispensaries are better
16 positioned to provide the kind and level of care that
17 VSP strives to offer its members."
18       Do you see that sentence?
19 A.    Yes.
20 Q.    Now, I think you earlier testified in this
21 deposition that there is no dispute that the Plaintiffs
22 in this case actually own their practices; is that
23 right?
24       MR. RENAUD: Well, the testimony will speak
25 for itself.

### Page 87

1        THE WITNESS: I don't recall saying that.
2  Q.    MR. KARP: Do you know whether or not the
3  Plaintiffs in this case actually own their practices?
4        MR. RENAUD: All the Plaintiffs, Counsel?
5        MR. KARP: Yes.
6        THE WITNESS: I don't know to what extent they
7  own their practices. But I don't believe that they
8  control their practices.
9  Q.    MR. KARP: And that belief is based upon the
10 Legal Department's review of the Franchise Agreement,
11 correct?
12 A.    It's based upon my staff's review of the
13 Franchise Agreement with Legal input.
14 Q.    Now, when you say in the sentence that it is
15 VSP's belief that doctors who own their practices are
16 better positioned to provide the kind of level of care
17 that VSP strives to offer, is there data that backs up
18 that belief?
19 A.    I don't know that I would say data, but we
20 have conducted studies -- or a study that I am aware
21 of, and certainly anecdotally have received complaints
22 from our members who may have gone out of network that
23 would reinforce our belief.
24 Q.    But this is a belief, is it not, it's not a
25 statement, correct?

### Page 88

1  A.    It's a belief.
2  Q.    And you said a moment ago "We did a study."
3  Is this the study to which you refer?
4  A.    It looks like it.
5  Q.    Do you want to take a moment to assure
6  yourself that it is?
7  A.    Uh-huh, yes.
8  Q.    And is this the study you referred to a moment
9  ago that you say supports the belief that you advance
10 in the second sentence of paragraph 10?
11 A.    It's an example of information that supports
12 our belief, but it's not the basis of our belief.
13 Q.    I didn't ask you that. I asked you whether or
14 not it supports the belief that is expressed in the
15 second sentence of paragraph 10.
16 A.    It helps support the belief.
17 Q.    Are there any other documents, reports or
18 studies or similar documents that also support the
19 belief as expressed in the second sentence of
20 paragraph 10?
21 A.    Not that I am aware of.
22 Q.    Did VSP commission an outside firm to do this
23 study?
24 A.    I believe so. I was not involved in this
25 study.

**Page 89**

Q. Who would have been responsible for commissioning this study?
A. I believe that was conducted by the Marketing Department.
Q. And who is the head of the Marketing Department?
A. Kate Renwick-Espinosa.
Q. Do you know whether any similar studies have been done since the publication of this one?
A. Not that I am aware of.
Q. Are you familiar with this report?
A. Not at a detail level, it wouldn't be my function to review it and analyze it. I would get high level findings reported to me.
Q. Did you have the study available to you when you answered these Interrogatories in December of 2003?
A. I did not analyze or review the study before I signed the Interrogatory, but I was aware of the findings at a high level of the study.
Q. When you say at a high level, you mean in a summary fashion?
A. Yes.
Q. When you said before you signed the Interrogatory, did you mean that you were aware of the -- or have a summary of the findings of this report

**Page 90**

before you signed the Declaration?
A. Yes.
Q. Okay. Let's mark the study as the next exhibit in order.
(Plaintiff's Exhibit 25 was marked for identification.)
Q. MR. KARP: Now, in that second sentence of paragraph 10 you say that doctors who own their practice as well as the dispensaries are better positioned to provide the kind and level of care that VSP strives to offer their members.
Why did you use the words "better positioned"?
A. Because VSP strives to insure that our members receive the highest possible quality of care, and we believe that that care is best delivered by private practice doctors.
Q. And is that belief supported by any studies, documents, information or reports?
A. Other than the report that we just discussed?
Q. Are you saying the report we just discussed supports that conclusion?
A. I believe that the report's findings help support the conclusion.
Q. Okay. Are there any other reports, studies, documents or information that would help support VSP's

**Page 91**

belief that doctors who own their dispensaries and their practices are in a better position to provide the kind and level of care that VSP strives to offer?
A. Not that I am aware of.
Q. Do you have any documents, reports or information that would tend to show that doctors who own their practices as well as their dispensaries actually deliver better care than doctors who don't own their practices and their dispensaries?
A. No.
Q. Can I direct your attention to item a. on page 4. Here in the first sentence you say that "VSP wants to be sure that the person with whom it has a contractual relationship - the Member Doctor - is, in fact, the person making decisions regarding the practice and services rendered to the patients."
Have I accurately quoted you?
A. Yes.
Q. Do you have any documents or information to suggest that any of the Plaintiffs in this case are not actually the persons making the decisions regarding their practices and services rendered to the patients?
A. No.
Q. Let me direct your attention to paragraph b. on page 4. In it you say that "VSP is concerned that

**Page 92**

if a Member Doctor does not have ownership and complete control of both aspects (the practice and the dispensary), then the actual owner could place financial or other pressures on the Member Doctor to perform more expensive examinations than required."
Have I quoted you accurately?
A. Yes.
Q. Do you have any evidence or documents to suggest that either Pearle Vision or DOC Corporation have ever placed financial pressures -- excuse me, financial or other pressures on VSP Member Doctors to perform more expensive examinations than are required?
A. No.
Q. Do you have any evidence or documents to suggest that Pearle Vision or DOC has ever placed pressure on the Member Doctor to provide a less comprehensive examination than may be appropriate?
A. No.
Q. Do you have any documents or evidence to suggest that franchisee optometrists of Pearle Vision or DOC in general provide less comprehensive examinations than may be appropriate?
A. No.
Q. Do you have any documents or evidence to suggest that Pearle Vision or DOC Corporation have ever

**Page 93**

1 placed financial or other pressures on a Member Doctor
2 to prescribe eyeglasses that are not required?
3 A. No.
4 Q. Do you have any documents or evidence to
5 suggest that either Pearle Vision or DOC has placed
6 financial or other pressures on a VSP Member Doctor or
7 any of its franchisees to prescribe an inferior set of
8 eyeglasses?
9 A. No.
10 Q. Do you have any documents or evidence to
11 suggest that either Pearle or DOC has ever placed
12 financial or other pressures on any of its franchisee
13 optometrists to push extras on the patient?
14 A. No.
15 Q. What is an extra?
16 A. It could be additional options for a pair of
17 eyeglasses, such as certain coatings or special types
18 of lighter lenses.
19 Q. Do you have any specific evidence or documents
20 that would suggest that any Member Doctor that does not
21 have ownership and complete control of the practice and
22 the dispensary has ever done any of the things that are
23 listed in item b. on this page?
24 A. Anecdotally we have been made aware of
25 instances in which this has happened, but I don't have

**Page 94**

1 any specific report or data.
2 Q. How many reports have you received of that
3 kind in the 11 years you have been employed at VSP?
4 A. I don't know specifically.
5 Q. Has any report, study or examination been made
6 of those anecdotal reports?
7 A. Not that I am aware.
8 Q. And there are no statistics compiled anyplace
9 of it; am I right?
10 A. Not that I am aware of.
11 Q. Can I direct your attention, please, to item
12 c. on the same page.
13 Do you have any documents or evidence to
14 suggest that any franchisee optometrist of Pearle
15 Vision or DOC has ever turned dispensing
16 responsibilities over to a non Member Doctor?
17 A. No.
18 Q. Are you aware of any specific instance
19 involving any franchisee optometrist at Pearle Vision
20 or DOC where the VSP member was caught in the middle as
21 you describe it in this subparagraph c.?
22 A. No.
23 Q. Was there a specific incident or event that
24 caused you to give the Court this example in
25 subparagraph c.?

**Page 95**

1 A. We have received complaints from members in
2 the past that are consistent with the examples in this
3 document.
4 Q. And did any of those complaints involve
5 locations that were franchised and owned by
6 optometrists of Pearle Vision or DOC?
7 A. I don't know.
8 Q. Can I direct your attention, please, to the
9 top of page 5.
10 You testified earlier that there are a number
11 of doctors on the grandfathered list who are affiliated
12 with a franchise; is that correct?
13 A. Yes.
14 Q. Do you have any documents or evidence to
15 suggest that any of those doctors are not responsible
16 to VSP and to the patient/member for the quality of
17 service and materials they provide?
18 A. No.
19 Q. In paragraph d. you state that "VSP believes
20 that an eye doctor who owns and controls his or her
21 practice" -- let me strike that and start again.
22 In subparagraph d. you state that "VSP
23 believes that an eye doctor who owns and controls his
24 or her own practice is more likely to give excellent
25 service."

**Page 96**

1 Do you have any documents or information to
2 support that statement?
3 A. No.
4 Q. You further state that VSP believes that an
5 eye doctor who owns and controls his or her practice is
6 more likely to exercise independent professional
7 judgment unimpeded by commercial considerations.
8 Do you have any documents or information to
9 support that statement?
10 A. I don't have documents, but on -- but really
11 on both of these phrases we monitor very closely member
12 satisfaction with our doctors, and we continue to
13 evaluate their high satisfaction, and we also compare
14 it to members who go outside of our network, and the
15 satisfaction is not as high.
16 Q. So -- and who performed those studies or
17 surveys?
18 A. We have a department within the company that
19 monitors satisfaction with all publics called the
20 Customer Delight Department.
21 MR. RENAUD: I think so.
22 Q. MR. KARP: Has VSP ever done any comparative
23 study of satisfaction as between VSP Member Doctors and
24 franchised optometrists of Pearle Vision?
25 A. Not that I am aware of.