# EXHIBIT 36

**Plaintiff's Opposition to Motion for Summary Judgment**

MONTANA FIRST JUDICIAL DISTRICT

LEWIS & CLARK COUNTY

DAVID HARDY, individual, and as

member/owner of DOCHARDY.COM, LLC,

     Plaintiff,

     Vs.               No. CDV-2003-285

VISION SERVICE PLAN, a California

non-profit corporation,

     Defendant.

_____/

Deposition of

CHERYL ANN JOHNSON

Tuesday, July 27, 2004

Reported by:

SHARON CABELLO, RPR

CSR No. 3080

Job No. 44706A

2

```
 1                    APPEARANCES

 2    For the Plaintiffs:

 3         KELLER, REYNOLDS, DRAKE, JOHNSON &

 4         GILLESPIE, P.C.

 5         Attorneys at Law

 6         BY: JOE SEIFERT, Esq.

 7         50 South Last Chance Gulch

 8         P.O. Box 598

 9         Helena, MT  59624

10

11    For the Defendants:

12         VISION SERVICE PLAN

13         BY: RAOUL A. RENAUD, Senior Counsel

14            ROBERT E. MOSS, JR., Deputy General Counsel

15         3333 Quality Drive

16         Rancho Cordova, CA  95670-7985

17

18                    --oOo--

19

20

21

22

23

24

25
```

62

1   that information to the out-of-network provider?

2   A.      I don't know specifically what is provided to

3   the out-of-network doctor, that is handled in another

4   area.

5   Q.      Okay.  Have you reviewed Dr. Hardy's file in

6   this case?

7   A.      No.

8           MR. RENAUD:  You mean, ever, Counsel, or did

9   you mean in preparation for the deposition?

10          MR. SEIFERT:  I guess I mean ever.

11          THE WITNESS:  Not that I recall.

12  Q.      MR. SEIFERT:  Okay.  One of the things that --

13  one of the subjects referred to in our Interrogatory 9

14  that we referred to at the outset of your deposition

15  was VSP's national membership and the extent to which

16  it includes optometrists or ophthalmologists who are

17  also franchisees of regional or national vision

18  services or products companies.

19          Are you aware of whether or not there are any

20  optometrists or ophthalmologist who are VSP's -- on

21  VSP's panel and who are also franchisees of regional or

22  national vision services or products companies?

23  A.      Yes.

24  Q.      Okay.  Are you aware -- using that as a class

25  of doctors or as a group of doctors, are you aware of

63

1   any members of that group whose membership is not being
2   challenged by VSP?
3   A.      Not being challenged in that we are aware of
4   it, but doing nothing about it?
5   Q.      Yes.
6           MR. RENAUD:  Or have never done anything about
7   it.
8           MR. SEIFERT:  Well, doing nothing about it.
9           MR. RENAUD:  Currently.
10          THE WITNESS:  I would need you to define
11  "nothing about it."
12  Q.      MR. SEIFERT:  Okay.  I am aware that there are
13  Pearle franchisees who were parties to litigation
14  entitled Binder, et al., versus VSP, who have retained
15  their VSP membership.  Are you aware of that?
16  A.      Yes.
17  Q.      Other than those doctors, are you aware of any
18  other Pearle franchisees or franchisees of any national
19  company who are currently VSP members in good standing
20  whose membership is not being terminated?
21  A.      I would again need you to define "in good
22  standing."  I am aware of instances where we may be
23  aware of doctors who may be affiliated with some type
24  of franchise who are participants on our network, but
25  may have some type of restricted membership.

64

1   Q.      And without identifying those providers could

2   you further describe the providers you have in mind

3   that you were just referring to?

4   A.      Describe in what way?  Numbers, locations?

5   Q.      Yes, both.  Who are you talking about?

6   A.      We have some doctors in Texas and some doctors

7   in Michigan that would fall into that category.

8   Q.      And can you tell me why they are not subject

9   to efforts to terminate their membership?

10  A.      Because VSP made a business decision to retain

11  them.

12  Q.      Okay.  Why?

13          MR. RENAUD:  Object to the extent it may call

14  to attorney/client privileged information or

15  confidential settlement information.  But if you can

16  keep those two items out of your answer, you are all

17  set.

18  Q.      MR. SEIFERT:  Are you able to keep those two

19  items out of your answer?

20  A.      I can give you an example of the Texas doctors

21  which were needed to be retained due to the severe

22  impact that not having them would have on our member

23  and clients in that area, disruption, basically.

24  Q.      And what would that impact or disruption have

25  been?

65

```
1    A.      What do you mean?
2    Q.      I am asking you what you meant.  You said in
3    order to -- I think the substance of what you said was
4    in order to avoid an impact or disruption on VSP
5    members in the area served by those doctors you allowed
6    them to remain on your panel.
7    A.      Right.
8    Q.      So what was the impact or disruption to which
9    you were referring?
10   A.      Not having doctors available to our members.
11   Q.      Okay.  Is there any other geographic area
12   other than Texas where VSP has done that, to your
13   knowledge?
14   A.      Michigan.
15   Q.      And let's go back to Texas.  How many doctors
16   would you estimate we are talking about?
17   A.      I would say approximately 25 to 30, but I
18   can't be certain.
19   Q.      And can you tell me or do you know with what
20   franchising entities they are associated with -- with
21   what entities they are associated with.  Sorry, I
22   didn't intend for it to be like that.
23   A.      Today's Vision and I believe it's Texas State
24   Optical.
25   Q.      And are these doctors who are franchisees of
```

66

1    Today's Vision and/or Texas State Optical, are these

2    doctors who do not have complete control of their

3    practices and/or dispensaries?

4    A.       Yes.

5    Q.       And let's talk about the doctors you referred

6    to in Michigan.  Can you estimate for me how many

7    doctors you were referring to there?

8    A.       I don't know.

9    Q.       Can you tell me which franchises they are

10   associated with?

11   A.       No.

12   Q.       Can you tell me whether or not those are

13   doctors who by virtue of their relationship with some

14   franchising entity lack complete control of their

15   practices and/or dispensaries?

16   A.       Yes.

17   Q.       The doctors to which we were just referring in

18   Michigan who have been allowed to retain -- or who do

19   retain their VSP membership, were those doctors

20   admitted back in or about 1994 when VSP acquired

21   Northeast VSP?

22   A.       I believe so.

23   Q.       And things that I have read in preparation for

24   these deposition suggest that there at that time -- and

25   by that time I am referring to 1994 -- were

67

1   approximately 300 so-called chain employed

2   optometrists.

3       Recognizing that you don't know how many there

4   are, is that roughly -- does that roughly coincide with

5   the numbers that you thought existed?

6   A.      I believed there would be fewer at this point.

7   Q.      Can you estimate how many fewer?

8   A.      I don't know.  I would expect about 100 less.

9   Q.      Okay.  As far as you are aware has there

10  been -- say, in the last five years has there ever been

11  any undertaking or initiative by anyone at VSP to

12  identify franchise doctors who somehow may have gotten

13  on VSP's panel and terminate their membership?

14  A.      I would say that we have improved our ability

15  to be able to identify doctors that do not truly own

16  and control their practices.

17  Q.      And how have you done that?

18  A.      We have expanded the questions that we asked

19  on our credentialling and recredentialling application.

20  Q.      And when you say expanded, are you referring

21  to the new questions which ask specifically are you a

22  member of a franchise?

23  A.      Yes, that would be one of the questions.

24  Q.      Okay.  Have there been any other -- other than

25  changing the language of the questions that accompany

68

```
 1   the credentialling and recredentialling applications,
 2   has there been any other effort by VSP to go out and
 3   identify any franchise doctors on their panel?
 4   A.        Our recredentialling effort has had that
 5   effect because we did not always recredential our
 6   network.
 7   Q.        Okay.  Any other efforts?
 8   A.        Not that I can think of.
 9   Q.        In the course of our conversation regarding
10   market share and our reference to Deposition Exhibit
11   13, we discussed at some length market share and the
12   market share of private practice providers.
13             Does VSP actively track the market share of
14   private practitioners in the United States?
15   A.        I would say that we are aware of it.
16   Q.        And how do you become aware of it?
17   A.        That's not something that I do, so I can't
18   speak to the specifics of that.  But there are
19   publications and various pieces of information that are
20   communicated in the industry.
21   Q.        Is there a department here at VSP of which you
22   are aware that does do that?
23   A.        Marketing.
24   Q.        There are private practitioners, are there
25   not, who to your knowledge carry lines of merchandise
```

69

```
 1   or eyewear that are accompanied by restrictions on the

 2   method and manner in which they are advertised,

 3   displayed and marketed; true?

 4   A.      By the manufacturer?

 5   Q.      Right.

 6   A.      I am sure that there are.

 7   Q.      And does that result in the doctor's -- at

 8   least as far as dispensary goes, does that result in

 9   the doctor's loss of complete control over his

10   dispensary?

11   A.      No.

12   Q.      Why not?

13   A.      Because doctors would have the ability to

14   carry various lines and they can also choose whether or

15   not to carry a particular line or not.

16   Q.      Okay.  But if the doctor does carry a

17   particular line and if the doctor is required by the

18   manufacturer of that line to use a certain rack in

19   displaying it, to carry a certain number or a minimum

20   number of models from that line, and to advertise that

21   line in only a certain way, does that result in a loss

22   of control that is repugnant to Condition E?

23   A.      No.

24   Q.      Why not?

25           MR. RENAUD:  Previously asked, I believe.
```

70

1    Same question it sounds like, just restated it.

2    Q.      MR. SEIFERT:  Okay.  I will ask it again.  Why

3    not?

4    A.      Because the doctor can choose to carry that

5    line or not.  And if they have made the choice to carry

6    that line and wish to follow any restrictions placed on

7    them on that line, then I would not say that that is

8    the loss of complete control.

9    Q.      Okay.  Well, to analogize, a doctor in

10    Dr. Hardy's situation makes the initial choice to

11    accept the recommendations regarding marketing and the

12    conduct of his business from Pearle.  He could either

13    choose to be a franchisee or not choose to be a

14    franchisee, so isn't that analogous?

15    A.      To what?

16    Q.      To what you just described, to the doctor who

17    has the initial choice of selecting a particular line

18    of eyewear that imposes upon him restrictions in the

19    way that it is displayed and marketed.

20    A.      No.

21    Q.      Why not?

22    A.      Because that doctor can choose to follow the

23    -- can choose to be a Pearle franchisee or not.  The

24    doctor has the choice.

25    Q.      And thus has control over his practice, true?