UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIGHTON OPTICAL, INC., et al.,

      Plaintiffs,

v.

VISION SERVICE PLAN,

      Defendant.

_____/

Case No. 03-74974

Honorable Nancy G. Edmunds

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [86]**

This action arises from a dispute between a group of optometrists/ophthalmologists who have been or will soon be terminated as member providers by Defendant Vision Service Plan. Plaintiffs' Revised First Amended Complaint alleges that Defendant's conduct: (1) violates California law governing termination of membership in a California non-profit corporation; (2) breaches the contracts and implied covenants of good faith and fair dealing that govern their relationship; (3) constitutes tortious interference with their business relationships; and (4) constitutes monopolization and attempted monopolization in violation of the Sherman Act, 15 U.S.C. §2, the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq.*, the Massachusetts Antitrust Act, G.L. c. 93, § 1, *et seq.*, and the Florida Antitrust Act of 1980, Fl. Stat. 542.15, *et seq.* This Court has federal-question jurisdiction over Plaintiffs' Sherman Act claims, 28 U.S.C. § 1331, and both diversity and supplemental jurisdiction over Plaintiffs' state-law claims, 28 U.S.C. §§ 1332, 1367.

This matter is presently before the Court on Defendant's motion for summary judgment. For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.

On June 23, 2004, this Court issued an order adopting the Magistrate Judge's Report and Recommendation on Plaintiff Doctors' motion for a preliminary injunction, denying that motion ("Injunction Order"). The Injunction Order does not resolve any issues now before the Court on summary judgment. The findings of fact and conclusions of law made by a court when considering a motion for preliminary injunction are not binding on the Court in a subsequent determination on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 394-95 (1981); *William G. Wilcox, D.O., P.C. Employees' Defined Benefit Pension Trust v. United States*, 888 F.2d 1111, 1113-14 (6th Cir. 1989); *Guillermety v. Sec'y of Educ. of the United States*, 241 F. Supp. 2d 727, 731-32 (E.D. Mich. 2002) (observing that "[t]he preliminary injunction was head on an accelerated basis, and consequently, the parties did not have a chance to completely develop all of their legal arguments at the time of the prior hearing."). Therefore, the Court's findings of fact in the Injunction Order are not the facts controlling this motion and neither are the Court's conclusions of law. The factual landscape of this litigation has evolved substantially since the parties appeared before the Court in February 2004 to argue the motion for preliminary injunction.

## I.    Facts

### A.  Background Facts

Plaintiffs in this action are 11 optometrists or ophthalmologists who practice, respectively, in Michigan (8), Massachusetts (2), and Florida (1) and their practice entities (collectively "Plaintiff Doctors").

Defendant Vision Service Plan ("VSP") is a California not-for-profit corporation that provides vision care benefit plans to businesses, governmental agencies, healthcare insurers and other groups. Defendant VSP arranges for the provision of vision care services to beneficiaries of its plans through optometrists and ophthalmologists with whom it contracts through Member Doctor Agreements ("MDAs").

Each of the Plaintiff Doctors, other than Dr. Watsky, practices in a franchise of Pearle Vision, Inc., an optical retail system operated at approximately 850 optical retail locations across the United States. Plaintiff Dr. Watsky is a franchisee of D.O.C. Optics, a Michigan corporation that operates approximately 86 retail optical locations in six states. Plaintiff Doctors have operated or have been employed by a franchise or chain during the entire period that they have been VSP member doctors.

Each of the Plaintiff Doctors executed numerous MDAs with VSP, submitting re-credentialing applications to VSP every two or three years. Plaintiff Doctors contend that VSP has been fully aware of Plaintiff Doctors' respective franchise affiliations since at least 1995. In 1995, Plaintiff Doctors assert, VSP agreed that it would not terminate Plaintiff Doctors as member doctors based on their franchise affiliations. Accordingly, Plaintiff Doctors contend that, since 1995, Grandfather Agreements promising that they will not be terminated because of their franchise affiliations replace conflicting language in the MDAs and govern their contractual relationship with VSP. Member Doctors whom VSP placed on grandfather status, Plaintiff Doctors contend, were excused from having to comply with Condition E of the MDA.

Despite VSP's longstanding awareness of Plaintiff Doctors' franchise affiliations and the terms of their franchise agreements, Plaintiffs assert that VSP did not attempt to

3

terminate Drs. Nichols, Cannon, Skiba and Runstrom until March 9, 2003, Dr. Birchmeier until March 10, 2003, Dr. Watsky until July 16, 2004, Drs. Curtin and Eaves until October 8, 2004, and Dr. Schneider until November 24, 2004.  It was not until 2003 and 2004 that VSP sent Plaintiff Doctors 90-day notices of termination.  With the exception of Drs. Curtin, Eaves and Schneider, each Plaintiff Doctor's membership has been terminated.  Formal termination hearings for Drs. Curtin, Eaves and Schneider were scheduled for October 26, 2005.

Plaintiff Doctors assert that, contrary to the Grandfather Agreements governing their contractual relationship with VSP, the sole basis provided to them by VSP for the terminations was that Plaintiffs did not have complete control over their practices and dispensaries due to their respective franchise affiliations with Pearle and DOC, which VSP claims is contrary to Condition E of the MDA.  (Pls.' Sep. Stmt. of Material Facts, ¶¶ 125, 131-39, 147.)  VSP claims that Plaintiff Doctors subsequently requested that their "grandfather" status be removed and thus these Grandfather Agreements no longer governed their contractual relationship.  Plaintiff Doctors dispute these claims.

### B.  Procedural Facts

Plaintiff Doctors filed this lawsuit on December 10, 2003.  Before reassignment, Judge Woods adopted a Magistrate Judge's Report and Recommendation and denied the Plaintiff Doctors' motion for a preliminary injunction.  Plaintiffs appealed that Order.  While the appeal was pending, this matter was reassigned due to Judge Woods' retirement.  In February 2005, Plaintiffs filed a second motion for preliminary injunction.  This Court denied that motion, observing that the matter had been previously briefed, argued, decided and an appeal of that decision was presently pending in the Sixth Circuit Court of Appeal.

4

In October 2005, the Sixth Circuit Court of Appeals affirmed the district court's denial of injunctive relief, observing that:

> Our independent review of the substantive issues reveals a number of close questions, which include the extent to which California law governs the termination procedures used by VSP; whether, if California law governs, those procedures comport with that law; and the meaning of the phrase "complete control of all aspects of his/her practice, including dispensary" as used in the MDAs at issue.  However, simply because the claims at issue are closely contested does not mean that the district court abused its discretion in denying a preliminary injunction.   Plaintiffs must show a substantial likelihood of success on the merits; here they have only shown the possibility of success.

*Brighton Optical, Inc. v. Vison Serv. Plan*, No. 04-1870, Slip Op. at 4 (6th Cir. Oct. 7, 2005) (*Per Curiam*).

In May 2005, this Court also granted in part and denied in part Plaintiffs' motion seeking leave to file an amended complaint.  In light of the fact that discovery had closed and the dispositive motion cutoff date was fast approaching, this Court allowed Plaintiffs to amend their complaint to allege new claims including those concerning the breach of Grandfather Agreements as to existing Plaintiffs.  The Court denied Plaintiffs' request to add new party plaintiffs, concluding that to allow Plaintiffs to amend and add new party plaintiffs at this late stage of the litigation each time a member doctor is terminated would hinder the ultimate resolution of this case.  It further observed that the new proposed parties could file a separate action against VSP that would ultimately be addressed by this Court as a companion case.

Plaintiffs filed their First Amended Complaint on July 19, 2005.

On June 24, 2005, a companion case was also filed in this Court against VSP by three licensed optometrists with practices in Michigan who were currently members of VSP's

panel of optometrists, called "Member Doctors," that provide vision care services and materials to patients enrolled in VSP plans. (*Jeffrey Hagan, O.D., Jeffrey S. Hagan O.D., P.C., a Michigan Corporation, Kenneth Foon, O.D., Michael Liberman, O.D., and Detroit Optical Co. d/b/a D.O.C. Eyeworld Northland, a Michigan Corporation v. Vision Service Plan*, No. 05-72517.)   With the omission of antitrust claims, Drs. Hagan, Foon and Liberman's complaint asserts claims identical to those asserted here against VSP; i.e., that VSP's conduct: (1) violates California law governing termination of membership in a California non-profit corporation; (2) breaches the MDA and Grandfather contracts and implied covenants of good faith and fair dealing that govern their relationship; and (3) constitutes tortious interference with their business relationships.

In December 2005, this Court granted Plaintiff Doctors' motion for a preliminary injunction.  (*Hagan, et al. v. Vision Service Plan*, No. 72517, 12/15/05 Order, Docket No. 43.)  Because the claims at issue here are virtually identical to those presented in *Hagan*, the Court's findings of fact and conclusions of law are set forth below.

This Court made the following findings of fact.

On June 23-24, 1995, VSP's Board of Directors unanimously voted to extend "grandfather" agreements to the practitioner Plaintiffs and hundreds of other member doctors who were affiliated with a franchise, whereby VSP agreed to allow the doctors to retain their panel membership despite the fact that, in VSP's opinion, the doctors did not have ownership and complete control of their practices.  (12/15/05 Order, FF ¶ 4.)  VSP extended such grandfather or "restricted membership" agreements to all doctors on its panel who were affiliated with a franchise, totaling 271 in Michigan alone.  (*Id.* at FF ¶ 10.)  In accepting the terms of the grandfather arrangements, the franchisors elected to forebear

6

from pursuing litigation against VSP to enforce the rights of affiliated doctors who might otherwise have been dropped from VSP's panel.  (*Id.* at FF ¶ 12.)  VSP regularly referred to its grant of grandfather status as "the grandfather agreements."  (*Id.* at FF ¶ 13.)

VSP sent letters dated October 26, 1995 to some franchised doctors detailing the terms of the grandfathering.  The grandfather letters, which are identical to one another in all material respects, provide that the doctor "will be permitted to retain your VSP panel membership, so long as you remain employed by your present employer, practice at your present location and meet all other VSP rules and regulations."  (*Id.* at FF ¶¶ 14-15.) According to Jeff Vellenga, a VSP employee with direct responsibility for and firsthand knowledge of such matters, it was not necessary that each such franchised doctor receive a grandfather letter in order to be placed on grandfathered status; all VSP member doctors in 1995 who were affiliated with a franchise, chain or other retail-type entity were entitled to be placed on grandfather status.  (*Id.* at FF ¶ 18.)  VSP has represented that membership was "grandfathered" for all franchise-affiliated doctors in Michigan who were member doctors as of June 25, 1995.  (*Id.* at FF ¶ 20.)

VSP admits that member doctors whom it placed on grandfather status were excused from having to comply with VSP's "ownership and control" requirements (currently set forth in Condition E of the MDA), so long as they remained employed by their present employer, continued to practice at their present location, and met all other VSP rules and regulations. (*Id.* at FF ¶ 22.)  VSP's grant of grandfather status to the Plaintiffs was not time limited; the letters detailing the terms of the grandfather agreements do not state that the agreement would expire on any particular date.  (*Id.* at FF ¶ 23.)  VSP admits that each of the grandfather agreements was and is perpetual, and was intended to apply to each

7

successive MDA and each successive re-credentialing. (*Id.* at FF ¶ 24.) VSP intended that its grant of grandfather status to those doctors would extend as long as the doctors remained with their current employer and met all other VSP membership rules. (*Id.* at FF ¶ 25.)

On October 29, 2004, VSP asserted that all franchise doctors on its panel had been placed on a "limited" or "restricted" form of membership, explaining under oath that:

> All franchised doctors on VSP's panel are under a limited or restricted form of membership. This means that they are not allowed to add anymore VSP doctors to their practices, they may not move the practice, they may not sell the practice. These limitations are designed to ensure that, while the current VSP member doctor may retain membership, no additional doctors may join VSP as employees or owners of that practice and, when the member doctor retires or ceases to practice, the practice may not be sold to another VSP member doctor.

(*Id.* at FF ¶¶ 26-27.) VSP's Jeff Vellenga, one of the individuals who was directly responsible for compiling the list of VSP "grandfathered" doctors, testified that he had not heard such doctors referred to as being on a "restricted membership." (*Id.* at FF ¶ 29.)

In the *Brighton Optical* litigation, Case No. 03-74974, VSP produced four different lists, each generated during 2005, identifying approximately 265 member doctors who are affiliated with a franchise or chain. (*Id.* at FF ¶ 30.) Although VSP has no documents that indicate that the grandfather status of Drs. Hagan, Foon or Liberman was ever revoked, their names do not appear on the 2005 grandfather lists. (*Id.* at FF ¶ 31.)

VSP claims that it lost certain information that was maintained on its computer system that identified grandfathered doctors. VSP also admits that there may be inaccuracies in the grandfather list, and that certain doctors could inadvertently have been omitted. (*Id.* at FF ¶¶ 32, 33.) There are hundreds of member doctors on VSP's restricted membership

8

list that have not been the subject of any efforts by VSP to terminate their membership, and VSP maintains it made a "business decision" to retain each of those franchised doctors. (*Id.* at FF ¶ 35.)

VSP admits that it knowingly maintained VSP member doctors on its panel for many years despite being aware of the doctors' respective franchise affiliations. (*Id.* at FF ¶ 36, 50.) VSP admits that it concluded in 1996 that member doctors with franchise affiliations did not violate membership rules. (*Id.* at FF ¶ 51.) Despite its longstanding awareness of the franchise affiliations of Drs. Hagan, Foon and Liberman, and other VSP member doctors, as well as VSP's awareness of the terms of their franchise agreements, VSP did not attempt to terminate Drs. Foon and Liberman until December 12, 2004. (*Id.* at FF ¶ 43.)

VSP speculated, but provided no proof, that many doctors, including Drs. Hagan, Foon and Liberman, "found that the membership restrictions caused them difficulties and wanted to be free of them." (*Id.* at FF ¶ 49.)  Despite VSP's claims to the contrary, the matter of Drs. Foon and Liberman's grandfather status was not reflected anywhere in a July 24, 1996 letter from Dr. Foon, the August 28, 1996 fax from Jeffrey Vellenga, or the August 29, 1996 letter from DOC.  Mr. Vallenga's August 28, 1996 fax stated only that the letter from DOC was required "[t]o complete the review of your franchise situation."  The letter requested by VSP and obtained from DOC did not address in any manner DOC's purported control over Drs. Foon and Liberman's practice.  Rather, the August 29, 1996 DOC letter appears to solely benefit VSP, authorizing the doctors to use VSP's approved eyeglass frame vendors and laboratory service providers. (*Id.* at FF ¶¶ 53-56.)  Likewise, there was no evidence that Dr. Hagan requested to be removed from grandfather status. (*Id.* at FF

9

¶¶ 57-61.)

Mr. Vellenga is not aware of any record at VSP as to when or why a doctor was removed from the grandfather list. VSP's claim that Drs. Hagan, Foon and Liberman and other grandfathered member doctors agreed to waive their protection under the grandfather agreement is not supported by any evidence. VSP can identify only speculative, circumstantial evidence in support of its position, suggesting without explanation that "the only reasonable inference to be drawn" from the fact certain member doctors are no longer on the list of grandfathered doctors is that the doctors "were removed from the list due to circumstances that occurred during the intervening years. VSP's claim is even more dubious in light of the overwhelming evidence, including VSP's own admissions, as to the existence of the grandfather agreements with Drs. Hagan, Foon and Liberman in 1995. (*Id.* at FF ¶¶ 62-65.)

VSP's argument, that the restricted membership agreements must be interpreted as granting only a temporary waiver of the member doctor's compliance with VSP's membership requirements, fails. The argument is directly contrary to VSP's own admissions and internal memoranda confirming that the grandfather agreements were perpetual, and the grandfather letters themselves provide that the doctor "will be permitted to retain your VSP panel membership, so long as you remain employed by your present employer, practice at your present location and meet all other VSP rules and regulations." (*Id.* at FF ¶¶66-67.)

VSP's argument, that Section B.18 of the MDA constitutes an "integration clause" that invalidates any pre-existing grandfather agreements is similarly without merit. VSP presented no evidence that this section was intended to constitute an integration clause

10

with respect to the 1995 grandfather agreements, as that provision does not state that there are no other agreements or understanding between the parties.  Also, that section refers only to the verbal waiver of its terms; the grandfather agreement is a written instrument that has been ratified and confirmed by VSP in many different ways.  (*Id.* at FF ¶¶ 68-70.)

In 2004, VSP suddenly issued notices of termination to Drs. Hagan, Foon and Liberman.  The sole basis for the terminations is their alleged lack of complete control over their practices and dispensaries due to their franchise affiliations with DOC, which VSP claims is contrary to Condition E of the MDA.  Although VSP termination letters stated that membership were being terminated pursuant to the 90-day notice provision of the MDA, it subsequently conceded that the real reason for the termination was its belief that the doctors were in violation of Condition E providing that member doctors must have "majority ownership and complete control of all aspects of his/her practice, including dispensary".  (*Id.* at FF ¶¶ 75-79.)

VSP's Optometry Director, Denis Humphreys, O.D., acknowledged that it is VSP's Legal Department alone that determines that the member doctor lacks complete control over his practice and dispensary.  Dr. Humphreys admits, even though termination letters bore his stamped signature, he had no involvement in issuing them.  (*Id.* at FF ¶ 81.) VSP's Susan Egbert similarly testified that it is VSP's Legal Staff alone that determines whether a doctor's franchise agreement violates Condition E of the Member Doctor Agreement.  (*Id.* at FF ¶ 82.)

Although the membership of Drs. Foon and Liberman was being terminated for a purported violation of Condition E, VSP failed to disclose this basis to them in the initial termination letter or during the termination proceedings.  VSP did not indicate why it treated

11

these Plaintiff Doctors differently from the 32 other member doctors affiliated with DOC whom VSP is maintaining on its panel or why it is treating these Plaintiff Doctors differently from hundreds of other grandfathered doctors who are affiliated with a franchise whom VSP is maintaining on its panel.  (*Id.* at FF ¶¶ 83-85.)

In its December 15, 2005 Order Granting Plaintiff Doctors' motion for a preliminary injunction in *Hagan, et al. v. Vision Service Plan*, No. 72517, this Court made the following conclusions of law.

Plaintiffs have a strong likelihood of success concerning their breach of contract, breach of good faith and fair dealing, tortious interference with business relations, and declaratory judgment claims.  (*Id.* at CL ¶ 4.)

VSP's termination of Plaintiffs violates the terms of the grandfather and/or restricted membership agreements, which protect the Plaintiffs from termination for violation of Condition E due to their franchise affiliations.  By placing each of the practitioner Plaintiffs on grandfather status in 1995, VSP committed to the Plaintiffs and to DOC that it would never terminate the Plaintiffs based solely on their affiliation with DOC.  At no time did VSP ever notify any of the Plaintiffs that their grandfather status had been revoked; to the contrary, VSP has completely ignored the fact of the Plaintiffs' grandfather status during the course of their terminations in the apparent hope that the issue will simply go away. (*Id.* at CL ¶¶ 5-7.)

Plaintiff Doctors were not terminated in good faith.  VSP has been aware of the Plaintiffs' franchise affiliations throughout the course of their memberships.  VSP entered into "grandfather" or "restricted membership" agreements whereby it agreed that the Plaintiffs and dozens of other DOC affiliated member doctors would be allowed to retain

their memberships indefinitely notwithstanding their franchise affiliations.  VSP reviewed and approved the Plaintiffs' DOC franchise agreements in 1996.  VSP repeatedly re-credentialed the Plaintiffs every two to three years.  Then, without any evidence that the grandfather agreements were no longer valid, and despite the absence of any change in circumstances or evidence that DOC has exercised actual control over the Plaintiffs' practices, and despite continuing to agree to maintain 32 other DOC affiliated doctors on its panel, VSP suddenly claimed that the Plaintiffs were in violation of its membership rules by virtue of their affiliation with DOC.  Pretending that it had only recently learned of those franchise affiliations, VSP proceeded to terminate the Plaintiffs without any mention whatsoever of the grandfather agreements, without identifying a single aspect of the franchise affiliation that supposedly was problematic, without identifying or presenting a single witness to testify as to the reasons for the termination, and ignoring the express terms of its own Hearings Procedure.  (*Id.* at CL ¶¶ 8-13.)

## II.    Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue

13

of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Analysis

### A.  Violation of Membership Rights Without Due Process

Plaintiff Doctors' first claim is that, because VSP is a California nonprofit public benefit corporation, it is required under California law to follow statutory requirements, set forth in § 5341(c), ensuring that any termination of its members is done "in good faith and in a fair and reasonable manner." Cal. Corp. Code § 5341(b). Plaintiffs further assert that VSP violated Cal. Corp. Code § 5431 when it terminated them without good cause and not in a fair and reasonable manner. Defendant VSP moves for summary judgment arguing that, because Plaintiffs are not "Participating Members," defined in VSP's Restated Bylaws as doctors licensed to practice optometry in California, they are not entitled to the protections afforded under Cal. Corp. Code § 5341(b)-(c).

Plaintiffs respond that genuine issues of material fact exist on this claim, precluding summary judgment. This Court agrees.

14

Plaintiff Doctors present evidence that VSP conferred on them the status of "Participating Members" and treated them as such.  Plaintiffs argue that, because VSP's Bylaws grant Participating Members the right to vote on the dissolution of the corporation, they fall within the statutory definition of "Members" under Cal. Corp. Code § 5056(a),[1] and are entitled to the due process protections set forth in §§ 5341(b)-(c).

In support of their arguments, Plaintiff Doctors present evidence that:  (1) VSP admits that it conducted Plaintiffs' termination hearings pursuant to the provision in its Restated Bylaws that applies solely to Participating Members; (2) Plaintiff Doctors are required to comply with VSP's Restated Bylaws, which apply to only two classes of members:  Director Members and Participating Members; (3) the MDAs signed by Plaintiff Doctors provide that "I understand that if this application is accepted, <u>I shall be granted participating membership in VSP</u>"; (4) Plaintiff Doctors were terminated by committees which are empowered only to terminate Participating Members; (5) consistent with its authorization under its Restated Bylaws, VSP adopted payment schedules which it required Plaintiff Doctors and other Participating Members to accept concerning the professional services rendered by Plaintiff Doctors to VSP patients.  (Pls.' Ex. 22, Restated Bylaws; Ex. 25, Membership Applications; Ex. 87, VSP Fee Schedules; Ex. 68, Req. for Admission 27, 71, 81, 132, 168, 174; Ex. 55, Siesel Formal Hrg. Tr. at 1-2; Ex. 56, Nichols Formal Hrg. Tr. at 1-2.)  If VSP's Bylaws are construed to define "Participating Members" as only those optometrists licensed to practice

---

[1]Member is defined as:

> any person who, pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote . . . on a dissolution . . . .

Cal. Corp. Code § 5056(a).

in California, then numerous other provisions in the Plaintiff Doctors' MDAs would be rendered meaningless, including the requirement that member doctors must adhere to the Bylaws and the grant of authority to VSP to establish fee schedules.

In support of their claims that VSP violated § 5341 by not terminating their memberships in good faith and in a fair and reasonable manner, Plaintiff Doctors present evidence that: (1) VSP has been aware of Plaintiff Doctors' franchise affiliations throughout the course of their memberships; (2) VSP entered into "grandfather" agreements whereby it agreed that Plaintiff Doctors and hundreds of other member doctors would be allowed to retain their memberships indefinitely notwithstanding their franchise affiliations; (3) VSP reviewed and approved Plaintiff Doctors' franchise agreements in 1995, 1996 and 1997 and concluded that such agreements did not violate its membership requirement of ownership and complete control; (4) VSP regularly and repeatedly re-credentialed the Plaintiffs every two or three years; (5) VSP suddenly claimed that Plaintiff Doctors were in violation of its membership rules by virtue of their franchise affiliations, without any evidence that the grandfather agreements were no longer valid and while admitting that some grandfather agreements may have been misplaced due to "clerical error", and despite the absence of any change in circumstances or evidence that the franchisors have exercised actual control over Plaintiff Doctors' practices, and despite continuing to agree to maintain 29 other Pearle and 32 other DOC affiliated doctors on its panel; (6) VSP pretended at the time of the terminations that it had only recently learned of Plaintiff Doctors' franchise affiliations; and (7) VSP terminated Plaintiff Doctors without any mention of the grandfather agreements, without identifying a single aspect of the franchise affiliation that supposedly was problematic, without identifying or presenting a single witness to testify as to the reasons

16

for the termination.   (Pls.' Sep. Stmt. of Material Facts ¶¶ 1-170.)

## B. Breach of Contract and Implied Covenants of Good Faith/Fair Dealing

Plaintiff Doctors further allege claims that VSP breached their MDAs, Grandfather Agreements, and implied covenants of good faith and fair dealing.  VSP seeks summary judgment on these claims, arguing that:  (1) there is no breach of the only contract governing the parties' relationship, the MDA, because an integration clause in the MDAs signed by Plaintiff Doctors in 1999, 2002 or 2003, renders the 1995 Grandfather Agreements invalid; (2) pursuant to the clear and unambiguous terms of the MDA, VSP was not required to do anything more than give Plaintiff Doctors' 90 days written notice of termination; and (3) there can be no breach of an implied covenant of good faith and fair dealing because neither party to the MDAs had any reasonable expectation of a continuing contractual relationship beyond 90 days after notice of termination.

VSP's arguments require that this Court interpret three provisions in Plaintiff Doctors' MDAs:  the alleged integration clause (Member Doctor Obligations, ¶ B.18); the 90-day notice clause (Member Doctor Obligations, ¶ B.19); and the  "complete control" provision (Conditions of Membership ¶ E).  This Court has previously determined that Michigan law governs the Michigan Doctors' breach of contract claims.  (6/23/04 Order at 4, n.1.) Likewise, under Michigan's choice of law rules, the law of Massachusetts and Florida will govern similar claims of Drs. Curtin, Eaves, and Fowler. (3/5/04 R&R at 19, n.4.)  Because the general principles governing interpretation of contracts is substantively the same under Massachusetts and Florida law, the same analysis and conclusions apply to each of the Plaintiff Doctor's claims.  *See Dorson v. Dorson*, 393 So.2d 632, 633 (Fla. Dist. Ct. App. 1981); *Tucker v. Indian Develop. Corp.*, No. 985188, 2001 WL 417189, * 4 (Mass. Super.

17

Feb. 23, 2001).

### 1. Alleged Integration Clause

VSP argues that ¶ B.18 of the MDA is an integration clause that precludes consideration of any Grandfather Agreements.  Plaintiff Doctors, on the other hand, argue that ¶ B.18 precludes only oral waivers of its provisions whereas their repeatedly ratified Grandfather Agreements with VSP constitute written waivers of the "complete control" provision of their MDAs in that they protect Plaintiff Doctors from termination on the basis of their franchise affiliation.  (Pls.' Sep. Stmt. of Material Facts, ¶¶ 10, 16-46, 51, 54, 55-71.) Accordingly, Plaintiffs argue, these Grandfather Agreements must be considered when evaluating their obligations under the "complete control" provision of their MDAs.  This Court agrees with Plaintiffs' interpretation of ¶ B.18.  Moreover, because Plaintiff Doctors have presented evidence showing that genuine issues of material fact exist as to the existence, scope, and continued ratification of their Grandfather Agreements, summary judgment in VSP's favor on their breach of contract claims is precluded.

Paragraph B.19 provides that:

> all of the points in this Agreement, as well as the published VSP Articles, Bylaws, *Provider Reference Manual*, standards, protocols, rules and schedules of compensation, <u>together with amendments thereto</u>, <u>shall constitute the entire Agreement</u> between Member Doctor and VSP, and that <u>none of these provisions</u> therein <u>can be waived verbally</u> by any agent or officer of VSP.  The benefits of this Agreement are not assignable by Member Doctor, and any unapproved change of office address shall render the Agreement immediately void.

(Membership Agreement, ¶ B.18. (emphasis added).)  Plaintiff Doctors are correct.  The plain language of this paragraph does not preclude written waivers to provisions of the MDA.  This is consistent with the Court's finding in the companion case, *Hagan, et al. v.*

18

*Vision Service Plan*, Case No. 05-72517, that ¶ B.18 "refers only to the verbal waiver of its terms; the grandfather agreement is a written instrument that has been ratified and confirmed by VSP in many different ways." (12/15/05 Injunction Order, FF ¶ 70.)

### 2. Notice of Termination Clause

VSP also argues that ¶ B.19 of the Plaintiff Doctors' MDAs allows it to terminate their membership without cause as long as it provides them with 90-days' prior written notice. Plaintiff Doctors respond that ¶ B.19 must be read along with ¶ 9, Article III, of VSP's Restated Bylaws. This Court agrees. Reading the MDA as a whole and giving effect to each provision, ¶ B.19 should be interpreted as requiring VSP to give member doctors written notice stating the reasons for their member termination 90-days before that termination.

The Court begins by observing that VSP's Restated Bylaws are incorporated into the MDA. (MDA, ¶ B.18.) Article II, ¶ 9, of VSP's Restated Bylaws, expressly provides that: "with regard to any . . . termination proceedings" VSP is required to give "a Participating Member . . . fifteen (15) days prior notice of the . . . termination <u>and the reasons therefor</u>, and an opportunity to be heard, orally or in writing, not less than five (5) days before the effective date of the . . . termination." (VSP Restated Bylaws, Article II, ¶ 9 (emphasis added).) As previously discussed, Plaintiff Doctors present evidence that VSP conferred Participating Member status on them. Accordingly, to give effect to both provisions, the MDA requires VSP to provide Plaintiff Doctors with written notice of the reasons for their termination. This interpretation is consistent with ¶ C.6 of the MDA where VSP agrees "[t]o provide Member Doctor with written notice of the reasons for any adverse decision resulting in a change in membership status. . . ." (MDA, ¶ C.6.)

19

In light of the above contract interpretation and the evidence Plaintiff Doctors present, genuine issues of material fact exist concerning VSP's breach of their MDAs, their Grandfather Agreements, and the implied covenants of good faith and fair dealing. (Pls. Sep. Stmt. of Material Facts, ¶¶ 1-3, 8-14, 16-51, 54-140, 144-154, 157-170, 176-211, 212-217, 251-261, 276-288.)

Morever, as Plaintiff Doctors point out, the MDAs of Massachusetts Drs. Eaves and Curtin have an addendum replacing ¶ B.19 with a paragraph that provides in pertinent part that "Member Doctor may terminate this Agreement by giving VSP at least ninety (90) days prior written notice. VSP does not have the right to terminate this agreement without cause, save and except VSP may terminate this Agreement immediately if Member Doctor fails to comply with VSP policies, rules, guidelines and procedures." (Pls. Ex. 86, Addendum to MDA with VSP for the State of Massachusetts, p. 2.) Accordingly, summary judgment in VSP's favor on these claims is precluded.


### C. Tortious Interference

Under Michigan law, to prevail on a claim of tortious interference with business relationship, a plaintiff must establish: (1) that it has a valid business relation or expectancy; (2) the defendant's knowledge of that relationship or expectancy; (3) the defendant's intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the plaintiff. *Wausau Underwriters Ins. Co. v. Vulcan Develop., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003). Michigan law further observes that "'[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motivation.'" *Id.* (quoting *BPS Clinical*

20

*Labs. v. Blue Cross and Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996)).[2]

In support of their tortious interference claims, Plaintiff Doctors present evidence showing that: (1) they have established business relationships with hundreds of patients who are covered by VSP's vision care plans; (2) VSP is aware of those business relationships; (3) VSP terminated their memberships without cause or a good faith basis and thus actively encouraged hundreds of patients covered by VSP's vision care plans to discontinue their business relationships with Plaintiffs; and (4) this caused them damages. (Pls. Resp. at 31.) VSP argues that, because they had a right to terminate the MDAs on 90-days' written notice and were thus motivated by legitimate business reasons, Plaintiff Doctors cannot establish their tortitous interference claims. Because genuine issues of material fact exist whether VSP breached its MDAs with Plaintiff Doctors, VSP is not entitled to summary judgment on this claim.

### D. Antitrust Claims

Plaintiff Doctors' amended complaint alleges five antitrust claims. The first two allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, for monopolization and attempted monopolization in the prepaid primary vision care services market and in the market for prepaid primary vision care insurance. The remaining three allege violations of the antitrust laws of Michigan, Mich. Comp. Laws §§ 445.771, *et seq.*; Massachusetts, G.L. c. 93, §§ 1, *et seq.*; and Florida, Fl. Stat. §§ 542.15, *et seq.*

---

[2]Florida and Massachusetts law requires the same. *See Greenberg v. Mount Sinai Med. Center of Greater Miami, Inc.*, 629 So.2d 252, 255 (Fla. Dist. Ct. App. 1993); *Kibbe v. Potter*, 196 F. Supp.2d 48, 75 (D. Mass. 2002) (applying Massachusetts law).

VSP's motion argues that each of Plaintiff Doctors' antitrust claims fails because they: (1) fail to define a relevant market in which monopoly power could be obtained or maintained; and (2) fail to present evidence showing that VSP possesses monopoly power in the relevant market or had the requisite intent to obtain or maintain that monopoly. This Court begins by examining Plaintiffs' Sherman Act claims.

### 1. Sherman Act Claims

"A claim under § 2 of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means a opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'" *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985)). There are three essential elements of an attempted monopolization claim under Section 2 of the Sherman Act: (1) specific intent to monopolize, (2) anticompetitive conduct, and (3) a dangerous probability of success in achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993). To succeed on their "completed" monopoly claims, Plaintiff Doctors "must prove a general intent on the part of the monopolist to exclude". *Conwood Co.*, 290 F.3d at 782. To succeed on their attempt to monopolize claims, Plaintiff Doctors "must prove a specific intent to destroy competition or build a monopoly." *Id.* (internal quotes and citation omitted).

"In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability

22

to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.  To establish this essential element, the Court principally considers "the defendant's share of the relevant market." ABA Section of Antitrust Law, *Antitrust Law Developments* at 303 (5th ed. 2002).  It is also necessary for the plaintiff to show that "significant" entry barriers exist. *Id.* at 306.  "Other relevant factors include the strength and capacity of existing and potential competition, the concentration of the market, the trend toward greater or lesser concentration, the nature of the defendant's anticompetitive conduct, and the elasticity of consumer demand." *Id.* at 307.

To survive VSP's motion as to their § 2 Sherman Act claims, Plaintiff Doctors must first define the relevant product and geographic markets in which they compete with VSP. *Conwood Co.*, 290 F.3d at 782.  "A geographic market is defined as an area of effective competition.  It is the locale in which consumers of a product or service can turn for alternative sources of supply." *Id.* (internal quotes and citation omitted).  Plaintiff Doctors' definition of the relevant geographic market as encompassing Michigan, Massachusetts and Florida is not challenged here.  Rather, it is Plaintiff Doctors' definition of the relevant product market that demands close scrutiny.

Plaintiff Doctors define two relevant product markets:  (1) providers of primary vision care services to enrolled beneficiaries of VSP's vision care insurance plans in Michigan, Massachusetts and Florida; and (2) providers of prepaid primary vision care insurance. There are problems with both defined markets.  As to the second, Plaintiff Doctors are not competitors in the product market of prepaid primary vision care insurance.  That Plaintiffs participate with other managed vision care insurance companies that do compete with VSP does not make them competitors in the product market they define.  Nonetheless, Plaintiff

23

Doctors argue that, by terminating their MDAs with VSP, VSP harms competition in that relevant product market.  Plaintiffs' antitrust claims fail, however, because they present no evidence that VSP's conduct has or will harm competition in that insurance market. Accordingly, they cannot establish the essential element of "antitrust injury."  It is well-established that "[t]he antitrust laws are intended to protect competition, not competitors." *Id.* at 788 (citing cases).

Plaintiff Doctors' definition of the first product market is also flawed because it is too narrowly drawn.  "'To define a market is to identify producers that provide customers of a defendant firm (or firms) with alternative sources.'"  *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996) (quoting 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 530a, at 150 (1995)). "The market is composed of products that have reasonable interchangeability."  *Id.* (internal quotes and citation omitted).

In *Levine*, the Court rejected the plaintiff physician's argument that participating physicians in a single defendant health care insurance plan could constitute a separate product market.  *Id.* at 1552-53.  It observed that the plaintiff doctor "failed to present evidence showing how much more, if any, [defendant healthcare plan] enrollees must pay to visit a non-[defendant healthcare plan] physician."  *Id.* at 1553.  Likewise, the plaintiff doctor "offered no evidence to show that the cost to the enrollee of switching to another healthcare plan would be prohibitively expensive."  *Id.*  The *Levine* Court thus held that the plaintiff physician's "narrow definition of the relevant product market does not satisfy his burden of presenting prima facie evidence of the relevant market."  *Id.*

The same reasoning and result apply here.  Plaintiff Doctors fail to present evidence showing that VSP plan beneficiaries are precluded from seeking their professional vision

24

care services as non-member doctors or how much more, if any, VSP plan beneficiaries must pay to visit them as non-member doctors.   Plaintiff Doctors' narrow definition of the relevant product market is fatal to their federal antitrust claims.

"Relevant markets generally cannot be limited to a single manufacturer's products. As the Supreme Court recognized in *E.I. duPont de Nemours & Co.*, [351 U.S. 377 (1956)], manufacturers ordinarily should not be deemed to have 'monopolized their own products.'" ABA Section of Antitrust Law, *Antitrust Law Developments* at 566-57 (5th ed. 2002).  These same principles apply to relevant markets for services.   *Id.* at 565.   Following these principles in *Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York*, 40 F. Supp. 2d 109 (E.D. N.Y. 1999), the district court "rejected a relevant product market limited to patients of a single HMO, principally based on disagreement with 'the plaintiffs' assertion that a single firm's product can constitute a relevant product market."   *Id.* at 573 (quoting *Continental Orthopedic*, 40 F. Supp. 2d at 118).   Plaintiff Doctors' definition of the relevant product market here is similarly flawed because it is limited to the Michigan, Massachusetts and Florida beneficiaries of a single vision care insurance plan; VSP.   A single healthcare plan, like a single manufacturer, cannot be deemed to have monopolized its own services.

In light of the above, VSP is entitled to summary judgment on Plaintiff Doctors' federal antitrust claims.  The same holds true for Plaintiff Doctors' claims alleging violations of the antitrust laws of Michigan, Massachusetts and Florida.

## V.   Conclusion

For the above stated reasons, VSP's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

25

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 16, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 16, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager